OPINION OF THE COURT
Harold Hyman, J.
In this proceeding brought by the assignee for the benefit of creditors to and for: (a) Settle and have allowed its amended final account; (b) for leave to compromise its claims against Warshaw Bros, and Federal Construction Corp. for $1,000; (c) permit the claim against Gilbane Building Company (hereinafter Gilbane), be settled for $96,710.86 and to have such fund distributed to trust fund beneficiaries pursuant to section 71 of article 3-A of the Lien Law; (d) to allow the assignee commissions in the amount of $23,799.06; (e) to allow the attorneys for the assignee (two law firms) for alleged legal services rendered fees amounting to $67,500; (f) an allowance to the accountants for their alleged services in the amount of $3,500; and (g) other incidental relief, which this court construes to mean anything which the court is empowered to act upon regarding the administration of this estate, including, but not limited to, the assignee, attorneys, accountant, auc *423 tioneers, or as to any third person who has been or may be involved.
I. THE GILBANE BUILDING COMPANY MATTER
Heretofore this court made known its position in two prior decisions with regard to the proposed Gilbane Building Company settlement, although, even at that time, the court did not have definitive information regarding the use of the alleged fund by the assignee for investment purposes. That information has been partially, but not entirely supplied by the assignee’s supplemental report and amended account of May 22, 1978 and the more definitively required assignee’s amended final account, required by the court, dated June 30, 1978.
The matter arises out of a contract for plumbing services and materials supplied by assignor, via its subcontractors to British Airways Terminal and Kennedy Airport.
There can be no doubt that these funds whether obtained by litigation or settlement are nevertheless "trust funds” within the purview of article 3-A of the Lien Law. Indicating such fact a prior Justice of this court on October 21, 1975, entered an order permitting the assignee to compromise the claim for $96,710.86, but directed that the assignee "hold any proceeds * * * as and for trust funds for all who may qualified [qualify] as trust fund beneficiaries in accordance with Article 3-A of the New York Lien Law”, and further provided, that "upon further order of this court the Assignee be and it is hereby authorized and directed to distribute from said trust fund to those determined to be trust fund claimants * * * in connection with said empowerment * * * the balance thereafter remaining, if any, shall be held by the Assignee as part of the general funds of the estate”. (Emphasis supplied.)
Following the entry of that order permitting compromise of the claim, the "attorneys” for Gilbane and the attorneys for the assignee entered into a written "escrow agreement” on August 17, 1976 wherein Gilbane agreed to deliver to the attorneys (for the assignee) $96,710.86 then being the fund held by Gilbane in trust as trustee pursuant to article 3-A of the New York Lien Law; said "attorneys” to hold such moneys in escrow in behalf of Astrove (assignor) for the benefit of its creditors for not longer than six months, upon the expiration of such period the fund was to be returned to Gilbane’s attorneys unless an order shall have been obtained during *424 said period which, inter alia, would direct Gilbane as trust fund trustee to pay such trust fund to Astrove or its assignee.
The "escrow agreement” further provided, and this was certainly not part of the court order of October 21, 1975 which permitted the compromise, that, "3. The estate of Astrove shall be permitted to retain any interest which accrues on the trust fund during the six month period.” (Emphasis supplied.)
It is the position of the assignee and its attorneys that since the "escrow agreement” specifically authorized the assignee to retain the interest earned on the settlement proceeds, that such interest, as earned on such settlement was "under any condition to be retained by the Assignee”; particularly so, it contends, since "The trust fund claimants have not objected to such interest retention, because of their realization that the Assignee and its counsel were the prime movers in creating the fund and that Article 3-A of the Lien Law allows compensation for attorneys’ fees for the successful litigant in such representative action”.
The assignee’s contention that it is entitled to commissions on the whole of Lien Law statutory "trust funds” allegedly collected by it, and that the Debtor and Creditor Law as well as the Lien Law "require this [such] result”, citing as its authority a certain Federal bankruptcy decision emanating out of North Carolina and Collier on Bankruptcy, would revert this court to law long since overruled, or not applicable to existing law since the amendments to the Lien Law creating article 3-A (L 1942, ch 808; Acquilino v United States of Amer., 10 NY2d 271).
By enactment of the amendments creating article 3-A (Lien Law), the Legislature sought to assure that the funds received by a contractor from an owner should reach their ultimate destination, that is, to labor and materialmen Acquilino v United States of Amer., supra). As was unequivocally stated and held in the latter cited case (p 280) "However valid, therefore, the conclusion may once have been that the section [prior in time to article 3-A] did not bar the contractor from using the moneys received for any purpose he chose, we hold that it is no longer applicable under the statute as it was amended in 1942. The only purposes for which the contractor may use the funds are trust purposes. In other words, such funds are to be 'applied first’ to the payment of statutory beneficiaries. The contractor has a beneñcial interest only in so much of the proceeds as remain after the claims of all *425 beneñeiaries have been settled” (emphasis supplied); and (pp 281-282) "And, finally * * * although the circumstance that the civil remedy provided is a class action may somewhat diminish a beneficiary’s rights, it cannot be said that it gives the trustee a property right in the fund or adds one iota to his power to control it * * * Our conclusion, then, is that, as a matter of New York law, a contractor does not have a sufficient beneficial interest in the moneys, due or to become due from the owner under the contract, to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid”. (Emphasis supplied.)
In cases prior to the amendments of 1942 it was suggested that the "trust” involved only the funds, the actual moneys, emanating from the improvement, but this can no longer be urged. Subdivision 1 of section 70 of article 3-A of the Lien Law (Definition and Enforcement of Trusts) specifically provides, in defining the "trust”, that "For the purposes of this section: (a) any right to receive payment at a future time shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or upon some other event”; and subdivision 3 provides that "Every such trust shall commence at the time when any asset thereof comes into existence, whether or not there shall be at that time any beneficiary of the trust”; and, in defining the term "asset”, subdivision 6 provides: "The assets of the trust of which a contractor is trustee are the funds received by him and his rights of action for payment thereof (a) under the contract for the improvement of real property” (emphasis supplied).
The above was further delineated with greater force in a proceeding identical with the present, that is, in an assignment for the benefit of creditors, wherein the court held, "It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor (see, e.g., Matter of Nunez, 226 N. Y. 246, 251; see, also, Restatement, Contracts, 2d [T. D., 1973], § 168; 3 Williston, Contracts [3d ed.], § 432). The principle applies with equal or greater force to an assignee for the benefit of creditors”. (Matter of International Ribbon Mills [Arjan Ribbons], 36 NY2d 121, 126.)
*426 Coming now, and again to the issue of whether the assignee is entitled to commissions on the "whole sum derived from the trusts involved”, and whether the attorneys for the assignee are entitled to an allowance for fees for the alleged collection thereof. In regard to both items afore-mentioned, we must also look to the statute involved.
Subdivision 2 of section 71 of article 3-A of the Lien Law specifically provides that: "The trust assets of which a contractor * * * is trustee shall be held and applied for the following expenditures arising out of the improvement of real property * * * and incurred in the performance of his contract * * * (a) payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen; (b) [and] (c) [certain] taxes [and] (d) payment of * * * benefits or wage supplements, [etc., and] (e) payment of premiums on * * * surety bond[s, etc.]”. Nowhere therein said statute does it permit the contractor (or in any case its assignee) to deduct, take or apply any commissions, nor does it allow for the payment of any attorneys’ fees therefrom and, the courts have so held (Naiztat Iron Works v Tri-Neck Constr. Corp., 62 Misc 2d 228, 230, 231; Schwadron v Freund, 69 Misc 2d 342, 345; Glazer v Alison Homes Corp., 62 Misc 2d 1017, 1019-1020).
Without question, the entire fund was a "trust fund” distributable only to the materialmen, laborers or servicemen for their supplying material or labor in connection with the improvement to the facility. As such "trust fund”, when received by the attorneys escrowees, it should have been distributed promptly by them. If, unfortunately or mistakenly the interest earned on the investment of said fund was delivered by the attorneys escrowees to the assignee, it created no title in the assignee for general estate purposes. At best, the delivery of the interest earned on such investment of escrow funds by the attorneys to the assignee "substituted”, if it can so be characterized, the assignee as "trustee” for said attorneys; but, and even then, only for the purpose of prompt distribution to those trust beneficiaries duly entitled thereto (Acquilino v United States of Amer., 10 NY2d 271, supra; Harman v Fairview Assoc., 25 NY2d 101; Seaboard Sur. Co. v Masschusetts Bonding & Ins. Co., 17 AD2d 795; Gotham Sand & Stone Corp. v Nuns of Order of St. Dominic, 33 Misc 2d 951; Lien Law, art 3-A, § 71). Contrary to the contention of the assignee the "trust funds”, the "interest earned thereon or the increase obtained by the investment thereof’ were not subject *427 to being diverted for any assignee’s commissions, attorneys’ allowances, general estate disbursement or expenditures for the general estate or anything except for direct pro rata distribution to the trust beneficiaries. At best, the court will recognize that the attorneys, by assisting in relieving the general estate from payment of the amount of such (trust) debt, may be entitled to a reasonable fee out of the general estate, but certainly not out of the "trust estate”.
It is to be noted that even the assignee admits that it never "received” the principal of the "trust fund”, although it agrees with its counsel that it should be included in the gross estate for its commissions and its attorneys’ allowances.
Any misconception of what a "trust” under article 3-A is, has definitively been made clear by the court’s statement in Onondaga Commercial Dry Wall Corp. v 150 Clinton St. (25 NY2d 106, 111); wherein the court stated: "What is a ’trust’ under article 3-A is so broadly stated as to include assets of every conceivable type and form arising from the work (§ 70). It includes ’every asset’ until ’every trust claim’ has been discharged (subd. 3). It includes causes of action as well as realized assets (subd. 2). Certainly money paid by owner to anyone in satisfaction of the contract would be impressed with this broadly inclusive trust.” (Emphasis supplied.)
If any question ever existed as to whether the "contract” itself was considered an "asset” subject to trust declaration, as is argued by assignee (quoting from Matter of Woven Tape Skirt Co., 85 NY 506), the issue has been laid to rest by Onondaga (supra).
As to the assignee retaining the "interest” in the general fund of the estate, no such authority ever existed in the assignee to do any such thing. Merely because counsel for Gilbane and the assignee’s attorneys had agreed that the "interest” be thusly retained, does not make it either legally proper or binding upon the trust fund beneficiaries, particularly since neither they nor the court were ever given any notice of such intended escrow agreement or the terms thereof prior to the court, on October 21, 1975 entering its order, or in assignee’s petition for said order.
Counsel complains that in early April, 1977 they submitted an order to show cause for notice to all creditors why the proceeds should not be disbursed to the trust fund claimants, but that the court refused to grant such an order. If counsel would have carefully and fully read the contents of said order *428 to show cause they would find that they primarily sought authorization to compromise the entire claim for the sum of $96,710.84, but such authorization had already been granted by the order entered in this court on October 21, 1975 and, upon which authority they contend they entered into the "escrow agreement” of August 17, 1976 and became the recipients of the escrow (trust) funds at that time.
What is more, by notice dated October 23, 1975, the assignee served and advertised its "notice to File Claims in connection with the BOAC Terminal, John F. Kennedy Airport [Gilbane] Job”, published it in the Long Island Press on October 30, 1975 wherein creditors were given until November 17, 1975 to file their claims. Additionally one of the claimants, Insurance Company of North America, (INA) was the recipient of two written stipulations signed by assignee’s counsel, the first dated November 14, 1975 extending INA’s time to file its claim to December 22, 1975.
Furthermore, it was apparent to the court and made known to the assignee by this court’s prior decision, that the "interest” obtained by investing such funds was considerable; and, as now more definitively indicated by assignee’s counsel, the assignee included in its account its intention to hold such "interest” for and apply it to the general fund of the estate.
As stated previously by the court in its prior decision, the assignee never had any right to any of those moneys either before or after the order permitting the compromise; primarily because the funds were delivered to the attorneys in escrow, not to the assignee, and they should never have been turned over to the assignee, also, since as "trust funds” they were never the property of the assignor or assignee at any time, nor was the assignee a "beneficiary of said trust”.
Assignee’s counsel states that pursuant to the "escrow agreement” of August 17, 1976, "they received the escrow of $96,710.86. Why it took from October 21, 1975 when the order authorizing the settlement was granted to finalize the settlement until August 17, 1976, 10 full months, remains a mystery, completely unexplained by either the assignee or its attorneys. But in any event the moneys were eventually received on August 17, 1976. Why need it have taken until November 1, 1976 to purchase the certificate of deposit? As a matter of fact, why was it even necessary to purchase anything or even open a bank account? The moneys were in escrow with counsel for the assignee and subject to immediate *429 pro rata distribution to "trust beneficiaries”. The "trust beneficiaries”, and the amounts due to them were presumptively known snee as early as November 17, 1975 (including INA); there were 10 claimants in all and most of their claims were filed prior to the end of 1975, except as to a few. As to those who filed beyond the November 17, 1975 date, the "interest” to which they are entitled shall be computed from the date of their filing; but as to those who filed on or before November 17, 1975 their pro rata share is entitled to have the interest added thereto from August 18, 1976 to November 1, 1976 at 5]4% per annum, and from November 1, 1976 to the date of payment at the same rate of interest received by the assignee from investments in certificates of deposits purchased with such funds.
In any event, the principal amount of $96,710.86 was not "received” by the assignee. As to the "intrest” the assignee allegedly received from the certificates of deposit of such principal invested, such "interest” is not subject to commissions or attorneys’ fees, since they have been held not to be and are legally not moneys "received” by an assignee whose rights therein were not greater than that of the assignor (see Matter of International Ribbon Mills [Arjan Ribbons], 36 NY2d 121, supra).
Under the circumstances, the principal amount in the escrowee attorneys’ hands, to which should be added the investment interest as aforestated, shall be returned pro rata to said attorneys escrowees promptly, for prompt distribution to the trust beneficiaries in accordance with the order of the court authorizing and approving said compromise (Oct. 21, 1975, Camello, J). There is, therefore, no further need for acceptance, nor was there any need for the assignee in his final report and account, verified February 10, 1978, to state that "If the court does not accept such settlement, pursuant to the Agreement between the parties, petitioner’s counsel will be required to returned such sum to Gilbane Building Company.” No such requirement has existed for over two years. The distribution should have been made at least 15 months ago. There was no reason for delay.
The attorneys escrowees are herewith directed to compute and obtain all "interest and investment monies” from the assignee as to this matter, and, as aforestated, to make distribution to the "trust beneficiaries” prompty and without delay. Such computation is the duty of the "escrowees”. The *430 above therefore, reduces the gross estate by the amount received as principal, and also for interest up to June 30, 1978, $7,866.26, plus interest to July 31, 1978 — $403.42, plus interest from July 31, 1978 to the date of the payments to be made pursuant hereto.
Upon the foregoing taking place, the assignee shall then file an affidavit in proof thereof, itemizing the pro rata share of principal and interest as aforestated, indicating that as to this (Gilbane) item the assignee has no remaining funds, whether of principal or interest; and it shall also file a second amended account accordingly.
III. THE RAISLER CORP. MATTER
This court, in its May 2, 1978 decision, made it clear that of the $32,000 compromise, $26,797.09 was paid directly to the subrogees of the "trust beneficiaries” who the surety on assignor’s "payment bond” was obliged to pay. The amount paid out was $26,797.09 (trust funds), leaving for general creditors $5,202.91. It is only as to the latter $(5,202.91) upon which commissions may be computed, and certainly not on the entire $32,000 nor on any interest which may have been obtained by the assignee by any investment of the principal thereafter.
V. THE CITY OF NEW YORK ACCOUNT
These moneys were never received by the assignee. As pointed out in this court’s decision of May 2, 1978 (94 Misc 2d 359) the moneys were paid out by the city directly to the "trust beneficiaries subrogee”, the surety company. The amount involved was $55,921.08, which the assignee urges should be considered part of the estate for commission purposes and attorneys’ allowances.
As to this matter, the assignee urges the use of the term "constructive receipt for commission purposes”, because, as it claims, the term is used by Collier on Bankruptcy (vol 2A, p 1802) which it is claimed indicates approval.
Of course our courts are not bound by decisions emanating out of the bankruptcy court; now will this court consider such as authority permitting the court to invade such statutory "trust funds” specifically made such by State law.
The statute, section 21 of the Debtor and Creditor Law, provides for commissions to be paid not upon a receipt of *431 funds created contractually but upon "the whole sum which will have come into his or their hands”.
The statutes and the legal authorities all forbid the application of any so-called "constructive receipt” to such "trust funds” (see cases cited under Part I hereof, "Gilbane”).
The court adheres to its original decision; the schedule should be amended accordingly as in Gilbane, Belmont, et al.
VI. As to the New York City bond deposit returns of $2,000, the New York State franchise tax refund of $1,119.85, and the Lincoln Rochester Trust Co. bank account balance remaining upon the execution of the assignment, $2,276.35. These items, upon which the assignee seeks commissions, all represent moneys which came into the estate merely by way of the "Assignment”, and upon which the assignee is not entitled to commissions. (Matter of Kraemer [Sandfield], 40 AD2d 1053, 1054; Matter of Hulburt, 89 NY 259; Matter of Woven Tape Skirt Co., 85 NY 506, supra; Matter of Fulton, 30 Hun 258; Cox v Schermerhorn, 18 Hun 16; Matter of Bunch, 12 Wend 280.) And, as stated by the court in Kraemer (supra, p 1054), "The Temporary Receiver was not entitled to commissions on the amount which was on deposit in the corporate bank account when he assumed his duties nor on the interest generated thereon since such sums were not received and disbursed by him”. This equally applies to "deposits” and "tax refunds” which were merely "transferred to the Assignee by the instrument of Assignment.”
VII. COMMISSIONS ALLOWABLE
The assignee, in its supplemental report and amended account, takes the position that section 21 of the Debtor and Creditor Law "mandates that the Assignee shall receive five percent on the whole sum which will have come into his hands.” That contention is clearly incorrect. The statute does not make or intend any such "mandate”. To the contrary, the statute unequivocally provides that an assignee shall receive a commission "of not to exceed ñve per centum” (emphasis supplied). The court has discretion to allow a reasonable commission to a worthy assignee of commissions up to, but not to exceed such 5%. Upon compliance with the directions of this court, and the filing of a second amended final account accordingly, this court will then determine the commissions if any, to which the assignee is or may be entitled.
*432 VIII. THE WARSHAW — FEDERAL CONSTRUCTION CORP. MATTER
As to this item, leave to enter into a compromise as requested is granted.
IX. Schedule "D” of the alleged account contains an item of $423.94 paid to Corwin & Frey (the attorneys for the assignee) for alleged "Actual disbursements to 1/19/76 and $180.26 actual disbursements to 6/1/77”. These items are not "itemized” but they should be, and the court expects that they can be so itemized, and that they will be in the assignee’s second amended final account which it is directed to file.
X. TAX AND PRIORITY CLAIMS
This estate is now 10 years old, and although for many years there have been sums greatly in excess of the amount due on priority tax and wage claims, which only amount to $17,013.60, such were not and have not as yet been paid. Such administering of an estate, is to say the very least, shocking and uncalled for. This indebtedness could have been and should have been paid shortly after the sale of the assets which resulted in a net receipt by the assignee of $21,148.41. By the end of 1968 the assignee had on hand, funds totaling $34,899.47. It is incomprehensible why such priority items were not paid promptly or even by the end of 1969. In view of such inordinate delay in paying said items, should it become necessary to now pay penalties or interest hereon, the assignee will be surcharged for such.
In any and all other respects this court adheres to its original decisions of May 2, 1978 and June 16 1978.
The assignee shall promptly file its second amended final account based upon this and the prior decisions of May 2, 1978 and June 16, 1978; the amended accounts shall contain a separate schedule by the assignee setting forth each of the "trust funds” received, the interest rate and interest earned from the investment of each said "funds” separately, the names and addresses of each trust fund beneficiary, the full amount of each trust claimant’s claim and the proportionate division of the principal and interest payable to each of them.
The second amended final account shall also set forth a schedule showing, in itemized form, each item assignee bases its claim upon for commissions and how its demands for commissions are computed.
The second amended final account shall be filed with the *433 clerk of the court and notification of such filing given to this court simultaneously therewith. The filing shall take place no later than October 6, 1978.
Upon receipt of a properly prepared account as aforedirected, this court will then pass upon the same, and also upon assignee’s commissions, if any, accountants’ fees and attorneys’ allowances, if any.
[Portions of opinion omitted for purposes of publication.]